Brody A. McBride (CA SBN 270852)
2011 Palomar Airport Road, Suite 101
Carlsbad, CA 92011
760-253-1231
brody@brodymcbride.com

Trenton G. Lamere (CA SBN 272760)
122 Mascoutah Avenue
Belleville, IL 62220
(618) 539-2328
trenton@lamerelegal.com

Elliott Jung (CA SBN 285491)
Michael Hernandez (CA SBN 292679)
Adam Hepburn (CA SBN 292736)
HEPBURN, HERNANDEZ & JUNG
TRIAL ATTORNEYS
2121 Palomar Airport Road, Suite 300
Carlsbad, California 92011
T: 888-505-2934
F: 877-808-8348
E: ejung@hhjtrialattorneys.com

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROSA ELENA CALVA-GARCIA, | Case No. **'22 CV 1478 MMA AGS** |
| Plaintiff, | |
| v. | **COMPLAINT FOR DAMAGES** |
| CITY OF SAN DIEGO, KELLY S. STEWART, ANDRES RUIZ, D. MIKE MULLINS, LARRY E. TURNER, CHRIS LUTH, | **DEMAND FOR JURY TRIAL** |
| Defendants. | |

## I.

## INTRODUCTION

1. About two months into the first COVID-19 lockdown throughout the State of California, toward the end of May 2020, Plaintiff Rosa Elena Calva-Garcia began experiencing a mental health crisis.

2. When Plaintiff broke her apartment window and began dropping household

1

COMPLAINT

items onto the sidewalk and street below, San Diego Police Department responded and proceeded to Plaintiff's apartment to arrest her.   Plaintiff barricaded herself in the windowless bathroom of her studio apartment.

3.   Less than 20 minutes after officers used a key to open the door to Plaintiff's apartment, Defendant Andres Ruiz shot Plaintiff three times in the torso, without warning, even though Plaintiff's hand, which held a kitchen knife, was under the control of Defendant D. Mike Mullins.

4.   Defendant Mullins then let a police canine bite down on Plaintiff's arm for a full minute, as Plaintiff lay crippled and moaning in pain.

5.   Plaintiff now sues Defendants for violation of her civil rights and for damages pursuant to 42 U.S.C. § 1983.

## II.

## JURISDICTION AND COMPLIANCE WITH STATUTE OF LIMITATIONS

6.   This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1331.

7.   Plaintiff has complied with the limitations period applicable to her claims brought under 42 U.S.C. § 1983, which period is governed by state law.  *Wallace v. Kato*, 549 U.S. 384, 387 (2007).  In California, a two-year statute of limitations applies to § 1983 claims.  *Jones v. Blanas*, 393 F. 3d 918, 927 (9th Cir. 2004).  This limitations period was tolled from April 6, 2020, through October 1, 2020, pursuant to Emergency Rule 9 of the California Supreme Court's Emergency Rules Related to COVID-19.  The incident giving rise to this action occurred on May 23, 2020, and the limitations period was tolled up to, and including, October 1, 2020, meaning the limitations period applicable to Plaintiff's claims did not begin to run until October 2, 2020.  Because this action is filed before October 2, 2022, it is timely.

## III.

## PARTIES

8.   Plaintiff is and was, at all times relevant to this complaint, a resident of this judicial district.  She sues in her individual capacity.

2

COMPLAINT

9.     Defendant City of San Diego ("City") is and was, at all times relevant to this complaint, a municipal entity duly organized under California law.  The San Diego Police Department ("Department") is the chief law enforcement agency for the City.  The Department, through its final policymakers, is and was, at all times relevant to this complaint, responsible for the policies, procedures, practices, and customs of the Department, as well as for the hiring, training, supervision, discipline, actions, and inactions of the City's law-enforcement officers and/or employees working for the Department.

10.     Defendant Stewart was, at all times relevant to this complaint, an individual acting under the color of state law and working in the course and scope of his employment by the City and Department as a police officer.

11.     Defendant Ruiz was, at all times relevant to this complaint, an individual acting under the color of state law and working in the course and scope of his employment by the City and Department as a police officer.

12.     Defendant Mullins was, at all times relevant to this complaint, an individual acting under the color of state law and working in the course and scope of his employment by the City and Department as a police officer.

13.     Defendant Turner was, at all times relevant to this complaint, an individual acting under the color of state law and working in the course and scope of his employment by the City and Department as a police officer.

14.     Defendant Luth was, at all times relevant to this complaint, an individual acting under the color of state law and working in the course and scope of his employment by the City and Department as a police officer.

15.     "Defendants" refers collectively to all individual defendants.

16.     At all times relevant to this complaint, Defendant Stewart was the supervisor of Defendants Ruiz, Mullins, Turner, and Luth.  Defendant Stewart was responsible for reviewing and approving these subordinate officers' plans, actions, and omissions.  And Defendant Stewart actively participated (on camera) in each of the decisions, actions, and

3

omissions of these subordinate officers, which actions and omissions form the basis of the claims Plaintiff alleges herein.

## IV.

## FACTS

**A.   Excessive Force**

17.   Plaintiff has a history of mental health issues and, on May 23, 2020, Plaintiff was experiencing a mental health crisis.  At that time, Plaintiff was living in an East Village studio apartment in a building known to house individuals struggling with mental health issues.

18.   Around 10:00 p.m. that night, Plaintiff broke a window in her apartment and began dropping household items onto the sidewalk and street below.  With the COVID-19 shelter-in-place order in effect, and the late hour, the street was largely empty, and no one was ever injured by anything that came from Plaintiff's window.

19.   San Diego Police Department responded to the scene, got a key to Plaintiff's apartment from a building manager, and went up to Plaintiff's apartment to arrest her.

20.   Even though officers knew Plaintiff was experiencing a mental-health crisis, officers made no attempt to de-escalate the situation or negotiate with Plaintiff.  Officers did not utilize a Psychiatric Emergency Response Team or a hostage negotiator trained to deal with barricaded individuals, or even attempt in good faith to convince Plaintiff officers were there to help her.

21.   Instead, without warning, officers used the key to open Plaintiff's door, and Defendant D. Mike Mullins began shouting at Plaintiff to come out, or he would release a canine to find and bite Plaintiff.  While he yelled, the canine's bark boomed through the bare-floored building.

22.   Plaintiff, largely silent throughout the interaction, had locked herself in the windowless bathroom of her studio apartment.

23.   Just fifteen minutes after opening Plaintiff's apartment door, Defendants Kelly S. Stewart and Andres Ruiz, escalated the situation by deciding to use a

4

sledgehammer to break a hole in the bathroom door.  After Defendant Christ Luth broke a hole in the door, Defendant Larry E. Turner immediately fired dozens of pepper balls (that is, plastic rounds filled with a chemical agent designed to incapacitate people).

24.     Just four minutes after that—even though Plaintiff was locked inside a small, windowless room, not posing an immediate threat to any of the officers present— Defendants Stewart, Ruiz, Mullins, and Luth escalated the situation further by deciding to breach the bathroom.  After Defendant Mullins attempted, unsuccessfully, to send the canine through the hole in the bathroom door, Defendant Ruiz kicked open the bathroom door.

25.     Defendant Mullins entered the bathroom first and immediately took control of Plaintiff, including her right hand, which was holding a kitchen knife, by grabbing Plaintiff's right wrist and pressing it against the bathroom wall.  In that position, Plaintiff, who is much smaller than Defendant Mullins, could not move the knife, which directed toward the ceiling at that point.

26.     Then—without any command to drop the knife, without any warning that deadly force would be used, and without any request by Defendant Mullins that deadly force be used— Defendant Ruiz shot Plaintiff three times in the torso.  Defendant Ruiz had opened fire less than twenty minutes after officers first opened Plaintiff's apartment door.

27.     As Plaintiff fell to the ground, the police canine took hold of Plaintiff, locking its teeth onto her left arm.  Even though Plaintiff had been crippled by the gunshot wounds, Defendant Mullins left the canine biting Plaintiff's arm for not just ten, twenty, or thirty seconds, but for a full minute as Plaintiff cried out in pain.

28.     Plaintiff miraculously lived through the shooting, albeit with permanent injuries.

29.     Plaintiff was charged with two assault charges and was found incompetent to stand trial.  She was, moreover, placed in a mental health diversion program, and her charges will be dismissed upon successful completion of that program.

COMPLAINT

**B.     Failure to Give Officers Resources Needed to Deal With Mentally Ill People**

30.     The use of excessive force on Plaintiff was consistent with, and a result of, the City and the Department's failure to give officers sufficient resources, including training, needed to interact with people experiencing a mental health crisis without violating their constitutional rights.

31.     The City and Department have been aware of this failure since at least 2010 when then police chief William Lansdowne noted an increase in police interaction with individuals "in deep emotional distress," explaining that "as the state cuts back and the county cuts back on those [mental health] issues, it's the responsibility of local law enforcement to manage them."

32.     In 2017, Mark Marvin, then director of San Diego County's Psychiatric Emergency Response Team explained: "Since 2009 . . . these [mental health] calls coming into dispatch of [a] psychiatric nature have increased 92 percent.   San Diego Police Department in the last year alone was roughly 110 percent."

33.     A study published by the San Diego County District Attorney in 2019 found that over the previous twenty-five years, 80% of officer-involved shootings included people who had drug or mental health issues.   In 2018 alone, there were more than 53,000 calls for service involving a mental health challenge.   Moreover, a study conducted from July to December of 2018 found that San Diego police were twice as likely to use force against people with disabilities during a stop.   And in 26 deadly force incidents between 2016 and 2018, 23% of these incidents involved individuals with mental health issues.

34.     According to the district attorney, "individuals in San Diego County facing mental health issues frequently come in contact with law enforcement and with our criminal justice system . . . .   *Too often, the outcome falls short of helping people who face those challenges*."

35.     The City and the Department have, more specifically, been deliberately indifferent to officers' failure to use appropriate and generally accepted law-enforcement procedures for handling persons people experiencing an obvious mental health crisis.

COMPLAINT

36.     For example, the California Commission on Peace Officer Standards and Training ("POST") sets the education and training requirements for California law-enforcement officers.  The minimum, mandated training for entry-level law-enforcement officers includes Learning Domain 37.  Learning Domain 37 provides the following tactical approaches to dealing with someone experiencing a mental health crisis:

| Calm the Situation | <ul><li>Take time to assess the situation</li><li>Provide reassurance that officers are there to help</li><li>If possible give the person time to calm down</li><li>Move slowly</li><li>When possible, eliminate emergency lights and sirens and disperse any crowd that may have gathered</li><li>Reduce environmental distractions such as radio or television noise</li><li>Assume a quiet nonthreatening manner when approaching and conversing with the individual</li><li>If possible, avoid physical contact if no violence or destructive acts have taken place</li><li>If possible, explain intended actions before taking action</li></ul> |
|---|---|

| Action | Additional Information |
|---|---|
| Communicate | <ul><li>Keep sentences short</li><li>Determine if the person is taking medication</li><li>Talk with the individual in an attempt to determine what is bothering that person</li><li>Acknowledge the person's feelings</li><li>Ask the person if he or she is hearing voices and, if so, what they are saying</li><li>Avoid topics that may agitate the person</li><li>Guide the conversation toward subjects that will bring the individual back to reality (e.g., where are you?, day of the week?)</li><li>Allow time for the person to consider questions and be prepared to repeat them</li><li>Do not mock the person or belittle his or her behavior</li><li>Do not agree or disagree with the delusions or hallucinations, but validate the feelings (i.e. "It must be frustrating for you to feel this way.")</li></ul> |
| Do Not Make Threats | <ul><li>Do not threaten the individual with arrest or in any other manner</li><li>Threats may create additional fright, stress, or potential aggression</li></ul> |
| Be Truthful | <ul><li>If the individual becomes aware of deception, that person may:<br>- withdraw from any contact in distrust<br>- become hypersensitive<br>- retaliate in anger</li></ul> |

COMPLAINT

37.     Here, the officers failed to provide reassurances that they were there to help; failed to give Plaintiff time to calm down; failed to move slowly; failed to reduce environmental distractions/noises; failed to use a quiet and non-threatening manner when communicating with Plaintiff; failed to explain intended actions before taking them; failed to talk to Plaintiff to determine what was troubling her; failed to acknowledge Plaintiff's feelings; failed to ask Plaintiff if she was hearing voices and what they were saying; and failed to ask questions that might guide Plaintiff back to reality.

38.     Instead, contrary to Learning Domain 37, officers repeatedly threatened Plaintiff with a barking police canine and then gassed her with pepper balls before forcing a confrontation with Plaintiff that resulted in Plaintiff getting shot and mauled by a canine—all within twenty minutes of first opening Plaintiff's apartment door.

39.     It was not until a month after this incident that the Department even created its own de-escalation procedure (Procedure 1.55), which provides:

> **V.    PROCEDURES/REQUIRED ACTIONS**
>
> A.    When given the time and opportunity, before approaching a subject, officers shall use all available information known at the time of the incident to help assess the situation. This assessment may include, but is not limited to the following:
>
>   1.    Obtaining relevant information regarding the incident.
>
>   2.    Conducting a threat/risk assessment of the incident.
>
>   3.    Considering other available resources and techniques including specialized units, PERT clinicians, and negotiators to resolve the incident.
>
> B.    When given the time and opportunity during an encounter, officers shall create distance by seeking cover and selecting positions that place physical barriers between the officer and the subject, creating a buffer zone. The creation of the buffer zone helps to reduce situational intensity by decreasing perceived pressure while continuing to control the operational space. Officers can move to a position that is tactically advantageous or allows greater distance in order to de-escalate a situation or deploy a greater variety of force options, including lesser force or no force at all.

40.     Here, Plaintiff was barricaded inside a windowless bathroom, creating a natural buffer between Plaintiff and the officers.  Officers nonetheless failed to use that

8

COMPLAINT

time and opportunity to, for example, consult a clinician and/or negotiator.

41.   The fact that a dozen or more officers, including Defendant Stewart, a supervisor, were on scene during this incident, and not a single officer objected to the rapid and unnecessary escalation of a confrontation with an individual experiencing an obvious mental health crisis, demonstrates a serious lack of training regarding generally accepted-law enforcement procedures for handling people experiencing a mental health crisis.

42.   As further examples of the City's and the Department's deliberate indifference to officers' training and supervision needs when it comes to interacting with mentally ill individuals:

a.   In February 2016, the American Civil Liberties Union of San Diego and more than two dozen other local organizations called on the Department of Justice to investigate the San Diego Police Department's use of force when encountering people with mental illness in volatile situations, compiling a list of "disturbing incidents that suggest the San Diego Police Department's pattern and practice of improperly handling incidents with people with mental illness or who are experiencing a mental health crisis."

b.   In April 2019, Department officers beat, tased, and used a chokehold on an un-armed mentally ill man, Douglas Pashuta, who did not immediately comply with an officer's order to leave a hotel lobby.

c.   In October 2020, a Department officer shot and killed a young Mexican man, Jose Alfredo Castro Gutierrez, who was experiencing an obvious mental health crisis when he ran toward officers with a small curtain rod.

d.   In February 2021, a Department officer shot 69-year-old Stephen Wilson, an individual with obvious mental health issues, while he was holding food with one hand and attempting to drop a kitchen knife he had in his back pocket with the other hand.

e.   In May 2021, Department officers tackled and beat Jesse Evans, an individual

9

with mental health issues, when he did not immediately comply with the officers' order to stop and talk to the officers after allegedly urinating in public.

43.   As a direct and foreseeable result of Defendants' actions and omissions, Plaintiff suffered general and special damages, including medical expenses, physical pain, mental suffering, loss of enjoyment of life, disfigurement, physical impairment, inconvenience, grief, anxiety, humiliation, and emotional distress.

## V.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### 42 U.S.C. § 1983 – Excessive Force

### (Against Stewart, Ruiz, Mullins, Luth, Turner)

44.   The foregoing paragraphs are incorporated herein by this reference.

45.   In using force against Plaintiff on May 23, 2022, Defendants each acted under color of state law.

46.   The force Defendants deployed against Plaintiff—including chemical inundation, gunshot wounds, and a canine bite—was excessive and unreasonable under the circumstances and, therefore, a violation of Plaintiff's Fourth Amendment right to be free from unreasonable seizures.

47.   Defendants were each an integral participant in the excessive force used against Plaintiff.

48.   Defendant Stewart was, moreover, an on-scene supervisor who was personally involved in, and approved, the use-of-force decisions made by his subordinates (namely, Defendants Ruiz, Mullins, Luth, and Turner).

49.   As a direct and foreseeable result of the excessive force used against Plaintiff, Plaintiff suffered general and special damages, including medical expenses, physical pain, mental suffering, loss of enjoyment of life, disfigurement, physical impairment, inconvenience, grief, anxiety, humiliation, and emotional distress.  Plaintiff thus seeks

COMPLAINT

1    monetary damages to compensate for these injuries, in an amount to be determined at trial.

2    50.    Further, because Defendants recklessly disregarded Plaintiff's Fourth

3    Amendment rights, Plaintiff seeks punitive damages against these defendants in an

4    amount that will both punish their conduct and deter such conduct in the future.

5                               **SECOND CAUSE OF ACTION**

6                             **42 U.S.C. § 1983 – *Monell***

7                                  **(Against City)**

8    51.    The foregoing paragraphs are incorporated by this reference.

9    52.    The City is liable for this deprivation of Plaintiff's Fourth Amendment rights

10   pursuant to the Supreme Court's holding in *Monell v. Department of Social Services of*

11   *the City of New York*, 436 U.S. 658 (1978), and its progeny, which provide that a local

12   governing body may be held liable for violations of constitutional rights committed by the

13   entity's employees if the violations arose from, among other things: (a) a settled practice

14   among the entity's employees and (b) deliberate indifference to training and supervision

15   needs of the entity's employees.

16   53.    The use of excessive force on Plaintiff resulted from a settled practice among

17   City and Department officers of using excessive force against individuals who are

18   vulnerable and mentally incapacitated (regardless of whether such incapacitation was

19   caused by illness and/or intoxication).

20   54.    The use of excessive force on Plaintiff resulted from the City's and the

21   Department's deliberate indifference to the training and supervision needs of officers

22   regarding appropriate and generally accepted law-enforcement procedures for handling

23   persons people experiencing an obvious mental health crisis.

24   55.    The City had actual and constructive knowledge that SDPD officers

25   frequently interact with mentally ill individuals and that such interactions require

26   specialized training, supervision, and resources.  The City and the Department failed to

27   provide such training, supervision, and resources to officers leading up to this incident,

28   and that failure amounted to deliberate indifference.  The incident giving rise to this action,

11

COMPLAINT

and the unfortunate events that led to it, are a highly predictable consequence of this deliberate indifference.

56.   The settled practice of officers using excessive force against mentally incapacitated individuals, and the City's and Department's deliberate indifference to officers' training and supervision needs, were each moving forces behind the violation of Plaintiff's constitutional rights.

## VI.

## PRAYER FOR RELIEF

57.   Pursuant to the foregoing causes of action, Plaintiff prays for the following relief:

a. on all causes of action, that judgment be rendered in favor of Plaintiff and against Defendants;

b. on all causes of action, that compensatory damages (including economic and noneconomic damages) be awarded in amounts to be determined at trial;

c. on the First Cause of Action, that punitive damages be awarded against the individual defendants in an amount sufficient to punish these defendants and deter such conduct in the future;

d. reasonable attorneys' fees, expenses, and costs of suit pursuant to 42 U.S.C. § 1988 and any other relevant rule, statute, or case law; and

e. any and all other relief in law or equity to which Plaintiff may be entitled and which this Court deems just and proper.

## VII.

## DEMAND FOR JURY TRIAL

58.   Plaintiff hereby demands a trial by jury of all issues and causes of action arising under law or that are otherwise triable by a jury.

Dated: September 30, 2022                     _s/Trenton G. Lamere_

                                             Attorney for Plaintiff

COMPLAINT